IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-8

No. 409PA20

Filed 11 February 2022

LUON NAY, employee

v.

CORNERSTONE STAFFING SOLUTIONS, employer, and STARNET INSURANCE COMPANY, carrier, (KEY RISK MANAGEMENT SERVICES, administrator)

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 273 N.C. App. 135 (2020), reversing and remanding an opinion and award entered on 22 February 2019 by the North Carolina Industrial Commission. Heard in the Supreme Court on 4 October 2021.

*Law Offices of Kathleen G. Sumner by Kathleen G. Sumner; David P. Stewart; and Jay Gervasi, P.A., by Jay A. Gervasi, for plaintiff-appellee.*

*Brewer Defense Group by Joy H. Brewer and Ginny P. Lanier for defendant-appellants.*

*Dickie McCamey & Chilcote, P.C., by Michael W. Ballance; Teague Campbell Dennis & Gorham, L.L.C., by Tracey L. Jones and Bruce Hamilton, for the North Carolina Association of Defense Attorneys and North Carolina Association of Self-Insurers, amici curiae.*

*Lennon, Camak & Bertics, PLLC, by Michael W. Bertics; Poisson Poisson Bower, PLLC, by E. Stewart Poisson, for the North Carolina Advocates for Justice, amicus curiae.*

ERVIN, Justice.

¶ 1        This case involves the issue of whether the Commission's decision concerning the method that should be utilized to calculate an injured worker's average weekly wages pursuant to N.C.G.S. § 97-2(5) and the Commission's determination concerning the extent to which the results obtained by a particular method for determining the injured employee's average weekly wages are "fair and just to both parties" so as to "most nearly approximate the amount which the injured employee would be earning were it not for the injury" are questions of law or questions of fact. After careful consideration of the relevant facts in light of the applicable law, we modify and affirm the Court of Appeals' decision and remand this case to the Commission for further proceedings not inconsistent with this opinion, including the entry of a new order containing appropriate findings of fact and conclusions of law.

## I.    Factual and Procedural History

**A. Substantive Factual Background**

¶ 2        On 25 August 2015, plaintiff Luon Nay began working for defendant Cornerstone Staffing Solutions, a staffing agency owned and operated by Thomas Chandler.   In the course of its business, Cornerstone places people seeking employment with companies in need of workers in the Charlotte-Mecklenburg and Rock Hill-York County regions.  According to Mr. Chandler, Cornerstone often places workers in jobs with logistics and manufacturing companies that pay between ten and thirteen dollars per hour, with its employees being primarily people who are

either unemployed and seeking full-time employment or are, while currently employed, seeking a better or higher-paying job. Mr. Chandler described many of the entities with whom Cornerstone places workers as "medium-size or small companies" that lack "broad Human Resources department[s]," with these entities having elected to use Cornerstone to hire their workers and take care of employment-related costs such as those involved in recruiting potential employees, performing drug tests and background checks, and the handling of "Medicare, Social Security, Workers' Comp," and any other expenses that are typically involved in the hiring of new workers.

¶ 3        At least ninety-five percent of the workers that Cornerstone places with other entities occupy "temp-to-perm" positions which will, hopefully, lead the entity with whom the worker has been placed to hire that worker to fill a permanent position at the end of a successful trial period. During the trial period, which typically lasts until the worker has worked for 520 hours with the entity with whom he or she has been placed, the worker is still technically employed by Cornerstone. After the worker has worked with the entity with whom he or she has been placed for at least 520 hours, the worker is typically either given full-time employment by the entity with whom Cornerstone has contracted or the assignment ends, with there being no guarantee that the worker will receive full-time employment at the conclusion of the 520-hour trial period.

¶ 4        Cornerstone placed plaintiff in a temp-to-perm position with FieldBuilders, an entity that creates and updates athletic fields and performs other landscaping tasks, with plaintiff having worked at FieldBuilders during the interval between 25 August 2015 and 7 December 2015. According to Mr. Chandler, a worker's schedule with FieldBuilders could be affected by the "[h]olidays, weather, [or] season." In the course of a typical week, plaintiff worked with FieldBuilders for eight hours a day for four to five days each week and was compensated at the rate of eleven dollars per hour. On occasion, however, plaintiff worked as few as six hours or as many as ten hours each day.

¶ 5        On 24 November 2015, while working with FieldBuilders, plaintiff and another worker attempted to lift a heavy machine into a truck given their inability to load the machine using the truck's broken ramp. As plaintiff tried to raise the machine, he heard a noise and felt a pop on the right side of his lower back and immediately recognized that he had been injured. The lower back pain that plaintiff was experiencing gradually worsened throughout the day upon which he was injured and the day after that. Although plaintiff attempted to return to work on the following Monday, he was only able to work for about four hours before his lower back pain forced him to stop. On 1 December 2015, plaintiff sought medical treatment for his persistent back pain and was prescribed medication and physical therapy. After a

treatment session on 22 December 2015, plaintiff stopped attending physical therapy due to increased lower back pain.

On 19 January 2016, Cornerstone filed a Form 19, which is titled "Employer's Report of Employee's Injury or Occupational Disease to the Industrial Commission," stating that plaintiff had worked with FieldBuilders for five days each week and that plaintiff had earned average weekly wages of $440.00. On 15 February 2016, Cornerstone filed Form 22, which is titled "Statement of Days Worked and Earnings of Injured Employee," reciting that plaintiff had worked for four days during the last week of August 2015, which was the first week during which he had been assigned to work with FieldBuilders; that plaintiff worked for five days each week during September 2015; that plaintiff worked for five days each week during October 2015; that plaintiff had worked for five days each week during three weeks in November 2015 and for four days during one week in November 2015; and that plaintiff had worked for three days during the first week of December 2015 and for one day during the second week of December, which was plaintiff's last day of work at FieldBuilders. Cornerstone's records indicated that plaintiff had earned a total of $5,805.25 during the sixteen weeks that he had been assigned to work at FieldBuilders.

On 8 March 2016, the Commission received a completed Form 18, which is titled "Notice of Accident to Employer and Claim of Employee, Representative, or Dependent," describing plaintiff's back injury. On 25 March 2016, Cornerstone filed

a Form 63 with the Commission and began directing the medical care that plaintiff received and paying temporary total disability benefits to plaintiff. In June 2016, plaintiff returned to Cornerstone for the purpose of seeking another job placement and was placed with an entity known as JMS, at which plaintiff worked for eight hours per day cleaning and polishing metal. After plaintiff had worked with JMS for three weeks, he was told that there was no more work for him at that placement and that Cornerstone had been unable to find another entity with which to place him.

**B. Procedural History**

¶ 8 On 21 July 2017, plaintiff filed a Form 33, which is titled "Request That Claim Be Assigned for Hearing," in which he claimed that Cornerstone had unilaterally lowered the amount of temporary total disability benefits that he had been receiving with respect to his back injury and that the parties had been unable to reach agreement with respect to the amount of benefits that plaintiff was entitled to receive. On 9 February 2018, plaintiff's claim came on for hearing before Deputy Commissioner David Mark Hullender. At the hearing, plaintiff contended that his average weekly wage was $419.20, which yielded a compensation rate of $279.48, while Cornerstone and defendant Starnet Insurance Company contended that plaintiff's average weekly wage was $111.64, which yielded a compensation rate of $74.43. The parties stipulated that Cornerstone had paid benefits to plaintiff at the rate of $258.03 per week between 1 December 2015 and 5 July 2016 and that

Cornerstone had lowered plaintiff's compensation rate to $74.43 per week after that point, with this figure having been derived by dividing the $5,805.25 in total earnings that plaintiff had received while working with FieldBuilders by fifty-two weeks. In an opinion and award filed on 7 June 2018, Deputy Commissioner Hullender found that the lower weekly compensation rate for which Cornerstone had advocated was the correct one. Plaintiff noted an appeal from Deputy Commissioner Hullender's order to the Commission.

¶ 9      On 22 February 2019, the Commission filed an opinion and award finding, in pertinent part, that "[d]efendants' modification of [p]laintiff's average weekly wage and compensation rate to $111.64 and $74.43, respectively, . . . was appropriate." In making this determination, the Commission reviewed the five methods for calculating an injured employee's average weekly wages set out in N.C.G.S. § 97-2(5), which states that

> [Method 1:] "Average weekly wages" shall mean the earnings of the injured employee in the employment in which the employee was working at the time of the injury during the period of 52 weeks immediately preceding the date of the injury, . . . divided by 52[.]
>
> [Method 2: [B]ut if the injured employee lost more than seven consecutive calendar days at one or more times during such period, although not in the same week, then the earnings for the remainder of such 52 weeks shall be divided by the number of weeks remaining after the time so lost has been deducted.

[Method 3:] Where the employment prior to the injury extended over a period of fewer than 52 weeks, the method of dividing the earnings during that period by the number of weeks and parts thereof during which the employee earned wages shall be followed; provided, results fair and just to both parties will be thereby obtained.

[Method 4:] Where, by reason of a shortness of time during which the employee has been in the employment of his employer or the casual nature or terms of his employment, it is impractical to compute the average weekly wages as above defined, regard shall be had to the average weekly amount which during the 52 weeks previous to the injury was being earned by a person of the same grade and character employed in the same class of employment in the same locality or community.

[Method 5:] But where for exceptional reasons the foregoing would be unfair, either to the employer or employee, such other method of computing average weekly wages may be resorted to as will most nearly approximate the amount which the injured employee would be earning were it not for the injury.

N.C.G.S. § 97-2(5) (2021). In its findings of fact, the Commission determined that the first and second methods set out in N.C.G.S. § 97-2(5) had no application to plaintiff given that he had not been employed by Cornerstone for the fifty-two week period immediately preceding his injury. In addition, in Finding of Fact 13, the Commission determined that the third method set out in N.C.G.S. § 97-2(5) was not appropriate for use in this case given that

[u]se of the 3rd method in this claim would produce an inflated average weekly wage that is not fair to [d]efendants because [p]laintiff was employed in a temporary capacity with no guarantee of permanent

employment, length of a particular assignment, or specific wage rate, and he was assigned to a client account whose work was seasonal. Thus, the 3rd method would not take into account that [p]laintiff was on a temporary assignment that in all likelihood would not have approached 52 weeks in duration.

After declining to use the fourth method on the grounds that "no sufficient evidence was presented of wages earned by a similarly situated employee," the Commission determined in Finding of Fact 15 that "exceptional reasons exist, and [p]laintiff's average weekly wage should be calculated pursuant to the 5th method," so that the $5,805.25 in total wages that plaintiff had earned while working with FieldBuilders over the course of the sixteen-week period prior to his injury should be divided by fifty-two in order to calculate plaintiff's average weekly wage. According to the Commission, "[t]he figure of $111.64 is an average weekly wage that is fair and just to both sides" because "[i]t takes into account that [p]laintiff was working a temporary assignment that most likely would have ended once he worked 520 hours" and that the average weekly wage that the Commission believed to be appropriate "annualize[d] the total wages that [p]laintiff likely could have expected to earn in the assignment." After making these findings of fact, the Commission repeated many of these determinations in its conclusions of law, concluding that the "calculation of [p]laintiff's average weekly wage via the 3rd method does not yield results that are fair and just to both parties," that the use of the "first [four] methods of calculating [p]laintiff's average weekly wage" would not be appropriate, and that "exceptional

reasons exist in this case, so [that p]laintiff's average weekly wage should be calculated based upon the 5th method as this is the only method which would accurately reflect [p]laintiff's expected earnings but for his work injury" and because the use of the fifth method "produces results that are fair and just to both parties." Plaintiff noted an appeal to the Court of Appeals from the Commission's order.

¶ 10        In seeking relief from the Commission's order before the Court of Appeals, plaintiff argued that (1) the Commission had erred by determining that the fifth method for calculating his average weekly wage was appropriate for use in this case, (2) that the use of the third method for calculating plaintiff's average weekly wage would be fair and just to both parties, and (3) that the use of the fifth method for calculating plaintiff's average weekly wage was unfair, unjust, and provided defendants with a windfall. In reversing the Commission's order and remanding this case to the Commission for further proceedings, the Court of Appeals began by holding that the Commission's decision to use the fifth method for calculating defendant's average weekly wage set out in N.C.G.S. § 97-2(5) was subject to de novo review given that the Commission's determination that this approach would be "fair and just" to both parties was "actually [a] conclusion[ ] of law to the extent that [it] declared a particular method of calculating [plaintiff's] average weekly wages to be fair or unfair." *Nay v. Cornerstone Staffing Sols.*, 273 N.C. App. 135, 142 (2020). In support of this determination, the Court of Appeals relied upon *Boney v. Winn Dixie,*

*Inc.*, 163 N.C. App. 330, 331–32 (2004), for the proposition that "[t]he determination of [a] plaintiff's average weekly wages requires application of the definition set forth in the Workers' Compensation Act, and the case law construing that statute" so as to "raise[ ] an issue of law, not fact." *Nay*, 273 N.C. App. at 141 (second alteration in original). In addition, the Court of Appeals cited *Tedder v. A & K Enterprises*, 238 N.C. App. 169, 173 (2014), in which it had relied upon *Boney* for the proposition that "review [of] the Commission's calculation of [the plaintiff]'s average weekly wages [is] *de novo*." *Nay*, 273 N.C. App. at 141–42. As a result, given its conclusion that the choice of a method for determining a plaintiff's average weekly wages was a conclusion of law, the Court of Appeals "review[ed] de novo the Commission's declaration that a Method 3 calculation of [plaintiff's] average weekly wages under N.C.G.S. § 97-2(5) was unfair in Finding of Fact 13, and that a Method 5 calculation of [plaintiff's] average weekly wages under N.C.G.S. § 97-2(5) was fair in Finding of Fact 15." *Nay*, 273 N.C. App. at 142.

¶ 11       After having identified what it believed to be the correct standard of review, the Court of Appeals addressed the issue of which method for calculating a plaintiff's average weekly wages would be "fair and just" to both parties and should, for that reason, have been used in calculating the relevant amount. *Id*. at 142–43. According to the Court of Appeals, "[r]esults fair and just . . . consist of such average weekly wages as will most nearly approximate the amount which the injured employee *would*

*be earning* were it not for the injury, in the employment in which he was working at the time of his injury." *Id.* (quoting *Liles v. Faulkner Neon & Elec. Co.*, 244 N.C. 653, 660 (1956)). The Court of Appeals further noted that, in the event that it "determine[d] Method 3 to be fair, [it] need not consider Method 5" given that "[t]he five methods [listed in N.C.G.S. § 97-2(5)] are ranked in order of preference, and each subsequent method can be applied *only if* the previous methods are inappropriate." *Id.* (citing *Tedder*, 238 N.C. App. at 173–74).

¶ 12    In the Court of Appeals' view, a calculation of plaintiff's average weekly wages utilizing the third method would be "fair and just" given that this determination was intended to reflect the amount that plaintiff would be earning in the absence of his compensable injury, with calculation of plaintiff's "average weekly wages according to what he earned from Cornerstone [divided by] the number of weeks he worked for the staffing agency fairly approximat[ing] what he would have earned but for the injury." *Id.* at 143. In determining that the third method for calculating plaintiff's average weekly wages would be fair and just to both parties, the Court of Appeals noted "the lack of a definite employment end date for [plaintiff] with Cornerstone is important" and the fact that plaintiff had "continued his relationship with Cornerstone after his injury and could have continued to earn money from Cornerstone indefinitely." *Id.* As a result, the Court of Appeals held that a calculation of plaintiff's average weekly wages using the third method "averages [his]

earnings over the course of his employment at Cornerstone, not a hypothetical 52 week period"; that this calculation produced results that were fair and just to both parties; and that the Commission's decision should be reversed and this case remanded to the Commission for recalculation of plaintiff's average weekly wage. *Id.* at 143–44. This Court allowed defendants' request for discretionary review of the Court of Appeals' decision on 3 February 2021.

## II. Analysis

### A. Parties' Arguments

¶ 13    In seeking to persuade us to overturn the Court of Appeals' decision, defendants begin by arguing that the Court of Appeals erred by utilizing a de novo standard in reviewing the Commission's decision concerning the manner in which plaintiff's average weekly wages should be calculated. In support of this contention, defendants direct our attention to this Court's decision in *Liles*, 244 N.C. at 660, in which we stated that the question of whether a method for calculating an injured employee's average weekly wages produces results that are "fair and just" "is a question of fact"; that, "in such a case[,] a finding of fact by the Commission controls [the] decision"; and that "this [principle] does not apply if the finding of fact is not supported by competent evidence or is predicated on an erroneous construction of the statute." In addition, defendants direct our attention to several earlier decisions in which we utilized the "any competent evidence" standard in reviewing the

Commission's findings of fact. *See Munford v. W. Constr. Co.*, 203 N.C. 247, 249 (1932) (stating that, since the "evidence indicated both shortness of time and casual nature of the employment[,] . . . regard sh[ould] be had to the average wages earned by others," with these considerations being "questions of fact for the [C]ommission to pass on"); *Mion v. Atl. Marble & Tile Co.*, 217 N.C. 743, 747 (1940) (stating that the Commission's findings "appear[ed] to be supported by the evidence except with respect to the average weekly wage"); *Early v. W. H. Basnight & Co.*, 214 N.C. 103, 107 (1938) (using the "any competent evidence" standard in reviewing the lawfulness of the Commission's findings of fact). According to defendants, this Court's precedent "requires application of the any competent evidence standard as opposed to the *de novo* review erroneously applied by the Court of Appeals" in reviewing a challenge to the lawfulness of the Commission's decision with respect to the manner in which an injured employee's average weekly wages should be calculated.

¶ 14        In addition, defendants argue that the Court of Appeals erred to the extent that it interpreted *Boney*, 163 N.C. App. 330; *McAninch v. Buncombe Cnty. Schs.*, 347 N.C. 126 (1997); and *Tedder*, 238 N.C. App. 169, as supporting the use of a de novo standard of review in evaluating the validity of plaintiff's challenge to the Commission's average weekly wages calculation. Similarly, as a matter of public policy, defendants assert that the use of a de novo standard of review in examining the Commission's decision concerning the manner in which an injured employee's

average weekly wages should be calculated would "create uncertainty and increased litigation with respect to the correct calculation of average weekly wage."

¶ 15        Finally, defendants argue that the Commission's determination that the use of the third method to calculate plaintiff's average weekly wages would be unfair to defendants was a finding of fact that should be upheld on the grounds that it had adequate evidentiary support.  In defendants' view, the record contains evidence tending to show that the amount of work that plaintiff would have expected to be assigned while working with FieldBuilders could have potentially been impacted by the weather or the season of the year; that plaintiff's assignment with FieldBuilders was temporary and would, "in all likelihood, . . . not have approached 52 weeks"; and that there is "no evidence [that] plaintiff ever earned or would have earned an annual salary close to" $21,798.40, which is the salary that correlates with plaintiff's contended average weekly wages of $419.20, so that "provid[ing] him benefits at this rate" would give plaintiff a "substantial, unfounded windfall."  Similarly, defendants contend that the record contains sufficient evidence to support the Commission's determination that the use of the fifth method to calculate plaintiff's average weekly wages would be fair to both parties on the theory that plaintiff would not have worked for an entire year with Cornerstone given that he would have "either been hired permanently by FieldBuilders and/or he would have experienced gaps in employment because another assignment could not be identified due to many different variables."

As a result, defendants urge us to reverse the Court of Appeals' decision and reinstate the Commission's order.

¶ 16 In seeking to persuade us to affirm the Court of Appeals' decision in this case, plaintiff argues that the Court of Appeals correctly utilized a de novo standard of review in evaluating the Commission's calculation of plaintiff's average weekly wages because the issue of whether a particular calculation is "fair and just to both parties" is either a question of law or a mixed question of law and fact. More specifically, plaintiff argues that, "[a]lthough there is some language in *Boney* supporting the proposition that the fair and just determination is, at least in part, a question of fact, it is nevertheless clear that the *Boney* Court properly employed a *de novo* standard of review" when it reviewed the Commission's conclusions, citing *Boney,* 163 N.C. App. at 331–32. According to plaintiff, the Court of Appeals, citing *Tedder*, 238 N.C. App. 169, and *Frank v. Charlotte Symphony*, 255 N.C. App. 269 (2017), and this Court, citing *Liles*, 244 N.C. 653, *McAninch*, 347 N.C. 126, and *Barnhardt v. Yellow Cab Co.*, 266 N.C. 419 (1966), *overruled on other grounds by Derebery v. Pitt Cnty. Fire Marshall*, 318 N.C. 192 (1986), have utilized a de novo standard of review in evaluating the validity of challenges to the Commission's average weekly wages calculation. In addition, plaintiff argues that average weekly wages of $419.20 would be fair and just to both parties given that this amount is "based upon [plaintiff's] actual weekly earnings," which are "the very same weekly earnings used by

[Cornerstone's] carrier to compute the weekly workers' compensation premium to cover the 'temp to perm' employees of [Cornerstone]."  Finally, plaintiff urges us to uphold the Court of Appeals' decision on public policy grounds and contends that, if the Court of Appeals' decision were to be reversed, injured workers would receive compensation based upon average weekly wages that would only be "a fraction" of the amount that they actually earned during their period of employment.

**B. Standard of Review**

¶ 17        "The findings of fact by the Industrial Commission are conclusive on appeal if supported by any competent evidence."  *Gallimore v. Marilyn's Shoes*, 292 N.C. 399, 402 (1977).  "The Commission's findings of fact are conclusive on appeal when supported by such competent evidence, 'even though there [is] evidence that would support findings to the contrary.' "  *McRae v. Toastmaster, Inc.*, 358 N.C. 488, 496 (2004) (alteration in original) (quoting *Jones v. Myrtle Desk Co.*, 264 N.C. 401, 402 (1965)).  The Commission's conclusions of law, on the other hand, are subject to de novo review on appeal.  *Id.*

¶ 18        Subsection 97-2(5) "sets forth in priority sequence five methods by which an injured employee's average weekly wages are to be computed" and "establishes an order of preference for the calculation method to be used," with the Commission to refrain from using the fifth method "unless there has been a finding that unjust results would occur by using the [four] previously enumerated methods."  *McAninch,*

347 N.C. at 129–30. "[T]he primary intent of this statute is that results are reached which are fair and just to both parties." *Id*. at 130 (citing *Liles*, 244 N.C. at 660). As we have already noted, the ultimate issue before us in this case is whether the Commission's selection of a method for calculating an injured employee's average weekly wages and the extent to which the method that the Commission has selected is "fair and just" is a question of law or a question of fact. In order to make this determination, we must begin by reviewing the relevant decisions of this Court and the Court of Appeals.

¶ 19        In *Liles*, this Court reviewed a Commission order entered in a case in which a worker had worked part-time for his employer until the time of the worker's death and in which the Commission used the third method (which is now the fourth method) described in N.C.G.S. § 97-2(5) for the purpose of calculating his average weekly wages. 244 N.C. at 658. In reaching this result, the Commission "conclude[d] as a matter of law that results fair and just to both parties [could] not be obtained" using the preceding statutory methods on the grounds that, in light of "the casual nature or terms of [the injured worker's] employment it would be impractical to compute his average weekly wage by basing [the] same on his average earnings for the previous 52 weeks" and that the injured worker's average weekly wages should be set at $34.88 "based upon the earnings of a person of the same grade and character employed in the same class of employment in the same locality or community." *Id*. at 656. On

appeal, this Court held that the Commission had improperly "determined the 'average weekly wages' of a part-time employee to be the amount he would have earned had he been a full-time employee" given that there was "no factual basis" for the Commission's use of the third (now fourth) method in light of the fact that the worker had been employed on a part-time basis and that there was "no evidence that any part-time worker, the nature of whose employment was similar to that of [the worker], earned 'average weekly wages' " that approximated those calculated under the third (now fourth) method. *Id.* at 658–59. In the course of making this determination, we stated that

> all provisions of [N.C.]G.S. [§] 97-2(e) must be considered in order to ascertain the legislative intent; and the dominant intent is that results fair and just to both parties be obtained. Ordinarily, whether such results will be obtained by the said second method is a question of fact; and in such case a finding of fact by the Commission controls [the] decision. However, this does not apply if the finding of fact is not supported by competent evidence or is predicated on an erroneous construction of the statute.
>
> The words "fair and just" may not be considered generalities, variable according to the predilections of the individuals who from time to time compose the Commission. These words must be related to the standard set up by the statute. Results fair and just, within the meaning of [N.C.]G.S. [§] 97-2(e), consist of such 'average weekly wages' as will most nearly approximate the amount which the injured employee *would be earning* were it not for the injury, in the employment in which he was working at the time of his injury.

*Id.* at 660. After concluding that "the evidence does not warrant a finding of fact or conclusion of law that the said second method would not obtain results fair and just to both parties," we held that the Commission erred by applying the third [now fourth] method rather than the second method, with the extent to which "fair and just" results had been obtained being dependent upon whether the Commission had correctly construed the relevant statutory language in accordance with its spirit and the underlying legislative intent. *Id.* at 660–61. As a result, a careful reading of our opinion in *Liles* indicates that we did not give significant deference to the Commission's decision concerning the manner in which the plaintiff's average weekly wages should be calculated in that case.

¶ 20    Approximately four decades later, we considered a case involving an injured worker who had been employed as a cafeteria worker for the Buncombe County Schools during the school year and as a babysitter, housekeeper, and painter during the summer months. *McAninch*, 347 N.C. at 128. In that case, the injured worker and the school system had entered into an agreement pursuant to which the defendant was required to pay the worker an amount of compensation based upon average weekly wages of $163.37, a rate that "did not reflect any wages [that] the [worker had] earned from other employment undertaken during the ten-week summer vacation." *Id.* After the Commission affirmed the average weekly wages determination to which the parties had agreed, the Court of Appeals reversed the

Commission's decision, holding that the Commission should have included the extra income that the worker had earned performing her additional jobs in its calculation and should have computed the plaintiff's average weekly wages by "aggregating her wages from defendant with her summer earnings and then dividing that sum by fifty-two." *Id*. at 129. This Court, in turn, reversed the Court of Appeals' decision, *id*. at 134, on the theory that the Court of Appeals' "recalculation of plaintiff's average weekly wages . . . through application of the fifth computation method constituted an improper contravention of the Commission's factfinding authority, and specifically its finding of fairness in this case," *id*. at 131.

¶ 21    In reaching this result, we quoted from our prior decision in *Barnhardt*, 266 N.C. at 427–29, in which we held that the fifth method for calculating an injured employee's average weekly wages did not give the Commission the "implied authority" to aggregate wages from multiple sources of employment in the course of calculating an injured employee's average weekly wages for the reason that such a result would be unfair to the employer. *McAninch*, 347 N.C. at 133. According to our decision in *Barnhardt*, "had the Legislature intended to authorize the Commission in the exceptional cases to combine those wages with the wages from *any* concurrent employment, we think it would have been equally specific," with it being unlikely "that the legislature would have left such intent solely to a questionable inference." *Id*. at 133–34 (quoting *Barnhardt*, 266 N.C. at 427–29). As a result, we concluded

that "the definition of 'average weekly wages' and the range of alternatives set forth in the five methods of computing such wages . . . do not allow the inclusion of wages or income earned in employment or work other than that in which the employee was injured." *Id*. at 134.

¶ 22      Our decision in *Barnhardt* involved a worker who had performed both part-time work as a cab driver and part-time work as a machine maintenance man. 266 N.C. at 420. After having become permanently disabled while working as a cab driver, the plaintiff sought workers' compensation benefits from the cab company. *Id*. In determining the amount of workers' compensation benefits to which the plaintiff was entitled, the Commission utilized the fourth (now fifth) method for calculating the plaintiff's average weekly wages, having combined the wages that the plaintiff had earned while working for both the cab company and the entity for which the plaintiff performed machine maintenance work. *Id*. at 422. In vacating and remanding the Commission's order, we stated that "[N.C.]G.S. § 97-2(5) contains no specific provision which would allow wages from any two employments to be aggregated in fixing the wage base for compensation" before noting that

> [u]nusally severe or totally disabling injuries are not the *exceptional reasons* contemplated by method (4) [now five].
>
> It seems reasonable to us that the Legislature, having placed the economic loss caused by a workman's injury upon the employer for whom he was working at the time of the injury, would also relate the amount of that loss to the average weekly wages which that employer was

> paying the employee. Plaintiff, of course, will greatly
> benefit if his wages from both jobs are combined; but, if this
> is done, Cab Company and its carrier, which has not
> received a commensurate premium, will be required to pay
> him a higher weekly compensation benefit than Cab
> Company ever paid him in wages. Whether an employer
> pays this benefit directly from accumulated reserves, or
> indirectly in the form of higher premiums, to combine
> plaintiff's wages from his two employments would not be
> fair to the employer.

*Id*. at 427 (citations omitted). In reaching this conclusion, we both interpreted

N.C.G.S. § 97-2(5) and applied our understanding of the relevant legal principles to

the facts of this case without making any obvious use of the "any competent evidence"

standard of review.

¶ 23         In *Boney*, 163 N.C. App. 330, the Court of Appeals discussed the standard of

review that a reviewing court should utilize in evaluating the validity of a challenge

to the Commission's average weekly wages determination. As an initial matter, the

Court of Appeals described the Commission's determination that the worker's

"average weekly wage of $194.88 yield[ed] a weekly compensation rate of $129.93" as

a conclusion of law, noting that the "determination of the plaintiff's 'average weekly

wages' requires application of the definition set forth in the Workers' Compensation

Act, N.C.[G.S.] § 97-2(5) (2001), and the case law construing that statute and thus

raises an issue of law, not fact." *Id*. at 331–32 (cleaned up) (quoting *Swain v. C & N

Evans Trucking Co.*, 126 N.C. App. 332, 335–36 (1997)). On the other hand, however,

the Court of Appeals stated that the issue of "[w]hether the results of calculating the

average weekly wage by the applicable enumerated method would be unfair to either employer or employee is a question of fact, and the Commission's determination on this issue would control, unless there was no competent evidence in the record to support the determination." *Id.* at 333. At the conclusion of its analysis, the Court of Appeals refrained from determining whether the Commission had erred in selecting a method for calculating the plaintiff's average weekly wages and, instead, remanded the case to the Commission for recalculation of the worker's average weekly wages given the Commission's failure to "clearly state what method it used to calculate [the worker]'s average weekly wage," *id.*, with the Court of Appeals having instructed the Commission that, if it found on remand that "that the calculation of [the worker]'s average weekly wage by use of the second method in N.C.G.S. § 97-2(5) would create an unfair result," it was authorized to "use an appropriate method to calculate [the worker]'s average weekly wage 'as will most nearly approximate the amount which [the worker] *would be earning* were it not for the injury' under the fifth method," *id.* at 334 (quoting *Liles*, 244 N.C. at 660).

¶ 24        In *Tedder*, 238 N.C. App. 169, the Court of Appeals reversed the Commission's average weekly wages calculation after utilizing what it described as a de novo standard of review. *Id.* at 173. In *Tedder*, the Commission had determined that the plaintiff had been hired by the employer to work for a limited period of seven weeks at a rate of $625 per week, during which time the plaintiff had injured his back. *Id.*

at 172.  After determining that the use of the first four methods for the purpose of calculating the plaintiff's average weekly wages would be inappropriate, the Commission had utilized the fifth method and determined that plaintiff's average weekly wages should be set at $625, even though the plaintiff would have only earned that amount for the seven-week period during which he had been employed by the defendant.  *Id*. at 175.  After citing *Boney* for the proposition that a "determination of the plaintiff's 'average weekly wages' require[d] application of the definition set forth in the Workers' Compensation Act, and the case law construing that statute[,] and thus raises an issue of law, not fact," the Court of Appeals stated that it would "review the Commission's calculation of [plaintiff]'s average weekly wages *de novo*," *id*. at 173 (quoting *Boney*, 163 N.C. App. at 331–32 (second alteration in original)), before reversing the Commission's decision with respect to that issue on the grounds that "it squarely conflicts with [N.C.G.S. § 97-2(5)]'s unambiguous command to use a methodology that 'will most nearly approximate the amount which the injured employee would be earning were it not for the injury,' " *id*. at 175 (quoting N.C.G.S. § 97-2(5) (2013)).  According to the Court of Appeals, the Commission's decision to utilize the fifth method for the purpose of calculating the plaintiff's average weekly wages created "a financial windfall for [the plaintiff] and an unjust result for" the employer in contravention of "the guiding principle and primary intent of the statute—obtaining 'results that are fair and just to both employer and employee.' "

*Id.* at 177 (quoting *Conyers v. New Hanover Cnty. Schs.*, 188 N.C. App. 253, 256 (2008)). As a result, the Court of Appeals remanded this case to the Commission for the making of a new average weekly wages calculation.

¶ 25        The difference between a question of law, on the one hand, and a question of fact, on the other, is well-established, although often difficult to determine. As a general proposition, questions of fact involve "things in space and time that can be objectively ascertained by one or more of the five senses or by mathematical calculation," *State ex rel. Utils. Comm'n v. Pub. Staff–N.C. Utils. Comm'n*, 322 N.C. 689, 693 (1988), while questions of law involve a "determination requiring the exercise of judgment or the application of legal principles," *State v. Sparks*, 362 N.C. 181, 185 (2008) (quoting *In re Helms*, 127 N.C. App. 505 (1997)). Although this Court has not, to the best of our knowledge, previously determined whether the selection of the proper method for calculating an injured employee's average weekly wages is a question of law or a question of fact, it appears to us that the making of the required determination involves "the application of legal principles" to the facts, making it, as the Court of Appeals correctly determined in *Boney*, a question of law that requires the Commission to properly apply the relevant statutory principles based upon findings of fact that are supported by "any competent evidence." *See Boney*, 163 N.C. App. at 331–32.

¶ 26    As we have already noted, this Court held in *Liles* that the extent to which the use of a particular calculation method produces a result that is "fair and just" was a question of fact, subject to the caveat that "the finding of fact is . . . supported by competent evidence" and does not rest upon "an erroneous construction of the" relevant statutory provision. *Liles*, 244 N.C. at 660. For that reason, we are unable to interpret *Liles* as requiring a single, universally-valid standard of review which applies to all issues that might arise concerning the "fairness and justness" of a particular Commission determination; on the contrary, the language in which *Liles* is couched, when read literally and in context, requires a reviewing court to undertake a much more nuanced analysis than either party seems to suggest. As a result, in the absence of a showing that the use of a particular method for calculating an injured employee's average weekly wages does or does not produce "fair and just" results lacks sufficient evidentiary support or rests upon an erroneous application of the relevant legal standard, which is whether the result reached by the Commission "most nearly approximate[s] the amount which the injured employee *would be earning* . . . in the employment in which he [or she] was working at the time of his injury," *id.*, the applicable standard of review is whether the Commission's decision with respect to that issue is supported by any competent evidence. In the event that the issue before the Court is whether the Commission's determination rests upon a

misapplication of the applicable legal standard, that determination is, according to *Liles* and its progeny, a question of law subject to de novo review.

¶ 27        The approach that we deem to be appropriate appears to properly reconcile the various decisions of this Court that the parties have discussed in their briefs. After acknowledging in *Liles* that "[t]he words 'fair and just' may not be considered generalities, variable according to the predilections of the individuals who from time to time compose the Commission," and must, instead, "be related to the standard set up by the statute," we reversed the Commission's average weekly wages decision on the grounds that the Commission's decision improperly applied the applicable legal standard without giving any apparent deference to the Commission's decision. *Id.* Similarly, in *Barnhardt*, we held that it "would not be fair to the employer" to combine wages from the worker's two jobs in calculating his average weekly wage, on the grounds that, "had the Legislature intended to authorize the Commission in the exceptional cases to combine those wages with the wages from *any* concurrent employment, . . . it would have been equally specific," and that it was "not likely that the legislature would have left such intent solely to a questionable inference." 266 N.C. at 427. In the same vein, our decision in *McAninch* relied upon a determination that the average weekly wages calculation that the Court of Appeals had deemed appropriate could not be squared with the relevant statutory language. In other words, neither *Liles*, *Barnhardt*, nor *McAninch* employs a simple sufficiency of the

evidence analysis; instead, all of them focus upon the extent to which particular "fairness and justness" determinations reflect a proper understanding of the relevant statutory language. As a result, it is clear that the understanding of the applicable standard of review set out above is completely consistent with the prior decisions of this Court, which subject what are essentially issues of statutory construction to de novo review regardless of whether they are made in the context of the selection of the appropriate method for determining an injured employee's average weekly wages or determining whether the use of a particular method would produce results that are "fair and just" in light of the applicable legal standard.

¶ 28      In its order, the Commission determined that the use of the third method for calculating plaintiff's average weekly wages set out in N.C.G.S. § 97-2(5) "would produce an inflated average weekly wage that is not fair to [d]efendants because [p]laintiff was employed in a temporary capacity with no guarantee of permanent employment, length of a particular assignment, or specific wage rate, and he was assigned to a client account whose work was seasonal" and that average weekly wages of $111.64 would be "fair and just to both sides" given that it took "into account that [p]laintiff was working a temporary assignment that most likely would have ended once he worked 520 hours" and that "annualize[d] the total wages that [p]laintiff likely could have expected to earn in the assignment." As we understand his brief, plaintiff's challenge to the validity of the Commission's determinations rests upon an

assertion that the approach adopted by the Commission cannot be squared with the applicable legal standard that has been enunciated by this Court. Although the record does contain sufficient evidence to support the specific factual assertions set out in the Commission's order, its analysis does not, at least in our opinion, reflect a proper understanding of that legal standard, which focuses upon whether, based upon a consideration of all relevant facts and circumstances, the chosen method for calculating plaintiff's average weekly wages "most nearly approximate[s] the amount which the injured employee *would be earning* . . . in the employment in which he [or she] was working at the time of his [or her] injury," *Liles*, 244 N.C. at 660 (emphasis added), given that dividing the wages that plaintiff earned over sixteen weeks by fifty-two, instead of sixteen, assumes that plaintiff would have only worked for Cornerstone for a fraction of a year in the absence of his injury, an assumption that might not be a plausible one given the existence of evidence tending to show that temporary employees sometimes worked more than 520 hours at specific assignments and the Commission's failure to find that plaintiff would not have received further work assignments from Cornerstone had he not sustained a compensable back injury (regardless of what the situation might have been with an "average" employee). As a result, since the Commission appears to have found the facts on the basis of a misapprehension of the applicable law, *McGill v. Town of Lumberton,* 215 N.C. 752, 754 (1939) (stating that it is still the rule that "[f]acts found under misapprehension

of the law will be set aside on the theory that the evidence should be considered in its true legal light"), and since the Court of Appeals appears to have made its own factual determinations in the course of reversing the Commission's decision rather than simply reviewing the Commission's decision using the applicable standard of review, we believe that the most appropriate disposition would be for this case to be remanded to the Commission for the entry of a order that contains findings and conclusions based upon a correct understanding of the applicable law.

## III.    Conclusion

Thus, for the reasons set forth above, we hold that the issue of whether the Commission selected the correct method for determining plaintiff's average weekly wages pursuant to N.C.G.S. § 97-2(5) is a question of law subject to de novo review and that the issue of whether a particular method for making that determination produces results that are "fair and just" is a question of fact subject to the "any competent evidence" standard of review in the absence of a showing that the Commission's determination lacked sufficient evidentiary support or rested upon a misapplication of the relevant legal principle, in which case the relevant issue of statutory construction is subject to de novo review on appeal.  We further hold that the findings and conclusions that the Commission made in support of its average weekly wages determination in this case appear to rest upon a misapplication of the applicable legal standard.  As a result, we modify and affirm the Court of Appeals'

decision and remand this case to the Commission for further proceedings not inconsistent with this opinion, including the entry of a new opinion and award containing appropriate findings of fact and conclusions of law.

MODIFIED AND AFFIRMED.

Justice BERGER did not participate in the consideration or decision of this case.

Justice BARRINGER dissenting.

¶ 30　　　　The issue before this Court is whether the Industrial Commission correctly calculated plaintiff's average weekly wage under N.C.G.S. § 97-2(5). The majority's answer to this question should be troubling for staffing agencies and similar entities who hire part-time or temporary workers. In a workers' compensation action, the determination of which method calculates an average weekly wage that is fair and just to both employee and employer is a question of fact. This Court's precedent has never indicated otherwise. Here, the Commission found that the fifth method, not the third method, produced results fair and just to both parties. Competent evidence supported this finding. As a result, this Court should affirm the Commission's opinion and award. Accordingly, I respectfully dissent.

## I.　　Background

¶ 31　　　　Defendant, Cornerstone Staffing Solutions, provides temporary staffing to businesses primarily located in and around Charlotte, North Carolina, and Rock Hill, South Carolina. Client businesses contract directly with defendant, and defendant then sends its employees to work for the client businesses for a limited period of time, generally 520 hours. Defendant recruits, hires, and manages the payroll of these employees, even though they complete work for the client business. Defendant's employees are paid only for time spent working for a client business. On average, employees work only ten weeks for defendant. Some employees go on to be hired by the client business, either during or at the end of the 520 hours. Others stop working

of their own volition or do not receive further work because defendant is unable to place them with another client business. Employment with defendant is limited by the needs of the client businesses and the qualifications of defendant's employees.

¶ 32        Plaintiff, Luon Nay, began working for defendant on 25 August 2015. Prior to working for defendant, plaintiff had not been able to find work for eight months. Defendant assigned plaintiff to work for Field Builders, a client business that creates and updates ball fields at schools and performs landscaping work. While on assignment with Field Builders, plaintiff suffered a compensable workplace injury. As a result, plaintiff ceased working for defendant on 7 December 2015 after working over 496.25 hours and earning wages of $5,805.25.

¶ 33        Plaintiff was medically released to full duty work in June of 2016—meaning he could accept any job without restriction. Plaintiff went back to work for defendant and was placed with another client. Three weeks later, however, that client had no more work for plaintiff. Plaintiff requested defendant find him another job, but defendant informed him that at the present time there were no jobs available, even though plaintiff had no medical restrictions. A week later, plaintiff checked again, and again there was no work for him. Later, plaintiff attempted to find work through another staffing agency, but it too was unable to place him.

¶ 34        After plaintiff's injury, defendant began paying disability benefits to plaintiff. Initially, defendant calculated plaintiff's average weekly wage by dividing plaintiff's

total wages of $5,805.25 across the fifteen-week period plaintiff worked for defendant, which produced an average weekly wage of $387.02. However, given the temporary nature of plaintiff's employment, defendant subsequently modified its calculation to $111.64, which was reached by dividing plaintiff's total wages across the previous fifty-two weeks. Plaintiff requested a hearing before the Commission to challenge this recalculation.

¶ 35 After a hearing, the presiding deputy commissioner entered an opinion and award finding that defendant had correctly calculated plaintiff's average weekly wage as $111.64. To reach this finding, the deputy commissioner found that given the temporary nature of employment with defendant, plaintiff's employment would not have "extended over a 52-week period if he had not been injured" and that there was no evidence of a similarly situated employee whose wages could be used to calculate plaintiff's average weekly wage. Thus the first four methods of calculating an average weekly wage laid out in N.C.G.S. § 97-2(5) did not produce results fair and just to both parties, and the deputy commissioner had to use the fifth method. Under this method, the deputy commissioner took into account the temporary nature of plaintiff's work and divided plaintiff's total wages by fifty-two weeks to reach an average weekly wage of $111.64.

¶ 36 Plaintiff appealed to the full Commission which entered an opinion and award using the same calculation as the deputy commissioner. The full Commission found

that plaintiff's employment with defendant "most likely would have ended once he worked 520 hours," and thus an average weekly wage of $111.64 calculated under the fifth method produced fair and just results.

¶ 37    Plaintiff appealed the opinion and award of the full Commission to the Court of Appeals. Reversing and remanding the Commission's opinion and award, the Court of Appeals held that the determination of which method calculates a fair and just average weekly wage was a question of law, subject to de novo review. *Nay v. Cornerstone Staffing Sols.*, 273 N.C. App. 135, 141–42 (2020). Next, the Court of Appeals examined the evidence and drew different inferences from it than those drawn by the Commission, finding that plaintiff "could have continued to earn money from Cornerstone indefinitely." *Id.* at 143. As a result, the Court of Appeals concluded that the third method produced an average weekly wage that was fair and just to both parties. *Id.* at 143–44. Defendant petitioned this Court for review.

## II.    Analysis

¶ 38    At issue in this case is whether the Commission correctly calculated plaintiff's average weekly wage under N.C.G.S. § 97-2(5). Subsection 97-2(5) requires that the calculation of an employee's average weekly wage produce "results fair and just to both parties." N.C.G.S. § 97-2(5) (2021). Results fair and just to both parties are reached when the Commission calculates an average weekly wage that "most nearly approximate[s] the amount which the injured employee would be earning were it not

for the injury, in the employment in which he was working at the time of his injury." *Liles v. Faulkner Neon & Elec. Co.*, 244 N.C. 653, 660 (1956) (citing N.C.G.S. § 97-2(5)).

¶ 39    This calculation requires the Commission to determine not only the rate of pay at the time of the injury but also the total number of hours the employee *would have worked* in a year for the employer if not for the injury. *See McAninch v. Buncombe Cnty. Schs.*, 347 N.C. 126, 128–31 (1997) (recognizing that because the plaintiff worked only forty-two weeks out of the year for the employer in whose employ she was injured, her average weekly wage would be calculated by extending her earnings from the forty-two weeks across an entire year). Determining the length of time an employee would have worked for an employer but for the injury is especially important in cases involving temporary or seasonal workers, where a failure to recognize the limited duration of employment would result in a windfall—with the employer paying far more in disability benefits than the employee would ever have earned if not for the injury.

¶ 40    To perform this calculation, N.C.G.S. § 97-2(5) "sets forth in priority sequence" five methods for calculating an employee's average weekly wage. *McAninch*, 347 N.C. at 129; N.C.G.S. § 97-2(5). The Commission must consider each method in turn, starting with the first method and only moving on to the next prescribed method if it finds that the previous one would not fairly or justly reflect the wages which the

employee would have been earning if not for the injury. *McAninch*, 347 N.C. at 129–30; *Liles*, 244 N.C. at 657–60. Whichever method the Commission first finds to accurately estimate the average weekly wage that the employee would be earning were it not for the injury is the one the Commission must use to calculate the employee's disability benefit. *McAninch*, 347 N.C. at 129–30; *Liles*, 244 N.C. at 660.

¶ 41        When a party appeals a decision by the full Commission to the North Carolina appellate courts, the appellate courts review the decision to "determine, first, whether there is competent evidence to support the Commission's findings of fact and, second, whether the findings of fact support the conclusions of law." *McAninch*, 347 N.C. at 131. Since this Court started reviewing the Commission's decisions, it has treated the calculation of an employee's average weekly wage as a question of fact. This case should be no different.

### A. The Calculation of an Average Weekly Wage that Obtains Fair and Just Results Is a Question of Fact.

¶ 42        Our precedent uniformly holds that whether a certain method calculates an average weekly wage that is fair and just is a question of fact. Most recently, in *McAninch v. Buncombe County Schools*, we held that, "the primary intent of [N.C.G.S. § 97-2(5)] is that results are reached which are fair and just to both parties. Ordinarily, whether such results will be obtained is a question of fact; and in such case a finding of fact by the Commission controls [the] decision." 347 N.C. at 130 (cleaned up). *McAninch*, when laying out this standard, quoted *Liles v. Faulkner Neon*

*& Electric Co.*, which, over forty years prior to *McAninch*, stated that N.C.G.S. § 97-2(5)'s: "dominant intent is that results fair and just to both parties be obtained. Ordinarily, whether such results will be obtained by the said second method is a question of fact; and in such a case a finding by the Commission controls [the] decision." 244 N.C. at 660. Notably, *Liles* did not distinguish between the question of whether results are fair and just and the question of whether a selected calculation obtains results that are fair and just, or hold that the first inquiry involves a question of fact and the second a question of law. Instead, it simply held that there is one single question of fact: whether the use of a given calculation method will produce results fair and just. *Id.*

Going back even further, *Early v. W. H. Basnight & Co.*, 214 N.C. 103 (1938), one of this Court's first decisions reviewing an Industrial Commission award, likewise treated as a question of fact the Commission's determination that "exceptional reasons" existed such that it needed to use the last method provided in the statute for calculating the employee's average weekly wage. *Id.* at 106–07. In no case has this Court reviewed the calculation method chosen by the Commission under a different standard. How many hours and at what rate are quintessential questions of fact. *See State ex rel. Utils. Comm'n v. Pub. Staff-N.C. Utils. Comm'n*, 322 N.C. 689, 693 (1988) ("Facts are things in space and time that can be objectively ascertained by one or more of the five senses or by mathematical calculation."). Accordingly, our review of

the Commission's calculation in this case should simply involve determining whether it was supported by competent evidence.[1]

**B. The Commission's Findings are Supported by Competent Evidence.**

Applying the correct standard of review to this case confirms that the full Commission's opinion and award should be affirmed. The Commission found as fact that none of the other methods in N.C.G.S. § 97-2(5) produced a fair and just result, and therefore, exceptional reasons existed for calculating plaintiff's average weekly wage pursuant to the fifth method. Further, in performing this calculation, the Commission complied with this Court's previous interpretations of N.C.G.S. § 97-2(5) by considering only the wages that plaintiff earned from the employment in which he was injured and disregarding all other sources or potential sources of income. *See Barnhardt v. Yellow Cab Co.*, 266 N.C. 419, 427–29 (1966), *overruled on other grounds by Derebery v. Pitt Cnty. Fire Marshall*, 318 N.C. 192 (1986). Accordingly, the opinion and award should be affirmed.

Plaintiff does not challenge the Commission's findings that the first, second, and fourth methods were improper for calculating plaintiff's average weekly wage.

---

[1] Of course, as *Liles* also notes, this Court will reverse the Commission's opinion and award if it is "predicated on an erroneous construction of the statute." *Liles v. Faulkner Neon & Elec. Co.*, 244 N.C. 653, 660 (1956). However, this statement has no bearing on whether the calculation of an average weekly wage according to the fifth (or any other) method is a question of fact—which *Liles* already answered in the affirmative. *Id.* Rather, it was merely a recognition of the fundamental principle that it is emphatically the province and duty of an appellate court to say what the law is. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

Additionally, plaintiff does not challenge the following findings by the Commission: Plaintiff suffered a compensable injury while working for defendant, a staffing agency. At the time of the injury, plaintiff was on a work assignment for one of defendant's clients, Field Builders. Plaintiff worked more than 496.25 hours for defendant from 25 August 2015 until 7 December 2015 and earned $5,805.25 total. Ninety-five percent of defendant's employees were placed in "temp-to-perm" positions. In a temp-to-perm position, an employee was eligible to be hired by the client after working 520 hours but had no guarantee of receiving an offer from the client.

¶ 46        Plaintiff does challenge the following findings by the Commission:

> [E]mployees for [defendant] worked an average of 10 weeks in the 52 weeks prior to [p]laintiff's work injury . . . .
>
>      . . . The 3rd method, which applies when the period of employment prior to the injury extended over a period fewer than 52 weeks, calls for the earnings of the employee to be divided by the actual number of weeks and parts thereof that the employee earned wages, provided that the result is fair and just to both sides. Use of the 3rd method in this claim would produce an inflated average weekly wage that is not fair to [d]efendant[ ] because [p]laintiff was employed in a temporary capacity with no guarantee of permanent employment, length of a particular assignment, or specific wage rate, and he was assigned to a client account whose work was seasonal. Thus, the 3rd method would not take into account that [p]laintiff was on a temporary assignment that in all likelihood would not have approached 52 weeks in duration.
>
>      . . . [T]he payroll data submitted into evidence

> merely shows the temporary and sporadic nature of a temporary employees' employment with [defendant].
>
> . . . The Full Commission finds that exceptional reasons exist, and [p]laintiff's average weekly wage should be calculated pursuant to the 5th method. Based upon a preponderance of the evidence in view of the entire record, the Full Commission finds that [p]laintiff would have at least worked 520 hours in his assignment with [Field Builders] but for his [24 November 2015] work injury. Thus, [p]laintiff's total earnings of $5,805.25 should be divided by 52 weeks, which yields an average weekly wage of $111.64 and compensation rate of $74.43. The figure of $111.64 is an average weekly wage that is fair and just to both sides in this claim. It takes into account that [p]laintiff was working a temporary assignment that most likely would have ended once he worked 520 hours . . . .

Reviewing the record demonstrates that these findings were supported by competent evidence. Thomas Chandler, CEO and owner of defendant, testified that defendant's clients would sign a contract with defendant agreeing not to hire an employee until the employee worked for 520 hours. Agreements like this were standard in the industry, though some companies used the term thirteen weeks—the weekly equivalent of 520 hours. Sometimes, a client would want to hire an employee full-time before the 520 hours were completed. In that situation, the client still had to pay defendant for the full 520 hours. However, many employees did not stay with defendant for the full 520 hours, as the average amount of time employees worked for defendant was ten weeks.

Chandler testified that if an employee was not hired by a client after working

a particular job assignment for 520 hours, the client rarely had the employee stay on, as the client would have to pay a premium to retain the employee through defendant. Typically, employees who were not hired were either let go or the assignment ended. When not assigned to a client, employees might wait a significant amount of time before another position became available. Thus, as Chandler noted, it was not "fair to say that there[ was] pretty much always a job available." Since employees could only be placed in positions for which they were qualified, an employee's language barrier might prevent him or her from finding a position. Plaintiff testified that he spoke very little English.

¶ 49        Chandler further testified that plaintiff was working for Field Builders, a company that creates or updates ball fields at schools and performs landscaping work. Field Builders's work can be impacted by the weather, the season, and holidays. Plaintiff had exceeded thirteen weeks with Field Builders and had completed over ninety-five percent of his 520 hours when he ceased working.

¶ 50        Plaintiff was injured in December 2015 but was medically released to full duty work in June of 2016—allowing him to accept any job without restriction. Initially, defendant found plaintiff work with a client for three weeks. However, after that job ended, defendant was unable to place plaintiff with another client. Later, a different staffing agency was also unable to find plaintiff work. Additionally, plaintiff was unable to find a job for the eight months preceding his employment with defendant.

This competent evidence supported the Commission's findings that plaintiff would have stopped working for defendant around 7 December 2015, regardless of the injury. As the Commission repeatedly stated, "[p]laintiff would have at least worked 520 hours in his assignment with Field[ ]Builders but for his November 24, 2015 work injury," "[p]laintiff was working a temporary assignment that most likely would have ended once he worked 520 hours," and plaintiff's employment with defendant "in all likelihood would not have approached 52 weeks in duration." Supporting this finding was the evidence that plaintiff had completed over ninety-five percent of the required 520 hours. Accordingly, either plaintiff would have reached 520 hours and been hired by Field Builders, or his position would have ended. If plaintiff had gone to work for Field Builders, any income he earned from them would not have counted toward his average weekly wage calculation since Field Builders was a different employer than defendant. *See Joyner v. A. J. Carey Oil Co.*, 266 N.C. 519, 521 (1966) ("When an employee who holds two separate jobs is injured in one of them, his compensation is based only upon his average weekly wages earned in the employment producing the injury."). Conversely, if the position ended, the Commission could reasonably infer that plaintiff would have ceased working for defendant since, when plaintiff returned to defendant in June of 2016 with no work restrictions, defendant was unable to find plaintiff a job, other than three weeks with one client. As such, the third method would not produce results fair and just to

defendant because it would compensate plaintiff for far more hours than he would have worked for defendant if he was not injured. Rather, a fair and just average weekly wage would reflect the Commission's finding that plaintiff would not have worked significantly longer for defendant. The Commission's chosen calculation under the fifth method—dividing plaintiff's wages by fifty-two weeks—obtained that outcome.

¶ 52        Perhaps different factual inferences could be drawn from the evidence. However, that is not the role of the appellate courts. Appellate courts review the Commission's resolutions of questions of fact simply to determine if they are supported by competent evidence; they do not "have the right to weigh the evidence and decide the issue on the basis of its weight." *Anderson v. Lincoln Constr. Co.*, 265 N.C. 431, 433–34 (1965). Competent evidence in this case supported the Commission's findings. Accordingly, we should affirm the opinion and award.

## III.    Conclusion

¶ 53        "The rule is well settled to the effect that, if in any reasonable view of the evidence it will support, either directly or indirectly, or by fair inference, the findings made by the commission, they must be regarded as conclusive." *McGill v. Town of Lumberton*, 218 N.C. 586, 591 (1940) (cleaned up). Here, a reasonable view of the evidence and fair inferences support the finding of the Commission that plaintiff's average weekly wage should be calculated according to the fifth method. Further, a

careful review of this Court's precedent demonstrates that the Commission's finding

rested on a proper interpretation of N.C.G.S. § 97-2(5). There is no need to remand

this case to the Commission for further findings or a reperformance of a calculation

that it has already correctly performed. Accordingly, I respectfully dissent.

Chief Justice NEWBY joins in this dissenting opinion.